Filed 10/30/24 In re D.P. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | B331753 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 22CCJP04769A-C) |
| Plaintiff and Respondent, | |
| v. | |
| E.P., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Temporary Judge. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

E.P. (father) appeals from the juvenile court's determination at a six-month review hearing under Welfare and Institutions Code, section 366.21, subdivision (e),[1] that his three children, D.P. (born November 2013), J.P. (born August 2015), and Ju.P. (born January 2018) (collectively, minors), were at substantial risk of detriment if they were returned to parental custody.  Father contends there was insufficient evidence to support the court's detriment finding.  Respondent Los Angeles County Department of Children and Family Services (Department) contends the court's detriment finding was supported by substantial evidence.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Interviews during the Department's initial investigation in December 2022 indicate that L.M. (mother) and father had an on-again, off-again relationship, and that since October 2019, J.P. has lived with father, while D.P. and Ju.P. lived with mother, and mother sometimes lived with maternal grandmother and sometimes with father.[2]  Father told the social worker he viewed

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Mother is not a party to this appeal.  We grant the Department's July 1, 2024 motion to correct and augment the record on appeal.  In doing so, we augment the record on appeal to include the sustained first amended petition and the Department's jurisdiction and disposition report, filed January 3,

it as a "red flag" that he was not permitted to record the social worker's interview of him. He demanded that J.P. be returned to his custody before Christmas, insisted that his due process rights were being violated, and continually expressed his discontent with the Department, his attorney, and the court. Father viewed himself as the victim and believed the dependency system operated only to help mothers.

In early January 2023, the juvenile court exercised dependency jurisdiction over minors based on the history of domestic violence between mother and father, mother's alcohol abuse, and father's failure to protect. Minors were ordered removed from parental custody and placed with maternal grandmother.[3] Father was ordered to participate in the following reunification services: (1) a domestic violence program; (2) a developmentally appropriate parenting program; and (3) individual counseling to address domestic violence, anger management, and father's reported concerns for ADHD, anxiety, and depression, and to develop appropriate coping mechanisms.

On January 30, 2023, father reported he had enrolled in a domestic violence program and a parenting program at a Baptist church in Hawthorne. By March 23, 2023, father had also completed an 11-week parenting program through Parents Anonymous. On March 23, 2023, the social worker submitted a referral to Parents in Partnership to provide additional support, but the program representative reported the next day that father

---

2023. We also strike from the record pages 125 through 143 of the clerk's transcript.

[3] Mother and father appealed, but their appeals were dismissed under *In re Phoenix H.* (2009) 47 Cal.4th 835.

seemed to lack understanding and was focused on maternal grandmother and perceived violations of his attorney-client privilege, rather than reunifying with minors. The representative was not able to redirect father.

By March 29, 2023, father had completed 8 sessions of a 52-week domestic violence program, and 8 sessions of a 12-week program called "Nurturing Fathers," both at the Baptist church. The counselor reported that father would argue with him and the pastor, and father was not benefitting or developing tools from the topics being discussed in the programs.

Father had monitored visits with minors three days a week, and the social worker observed him to be appropriately bonded to the children, who were excited to see him. Father engaged in activities with minors, but would continually discuss case-related issues with the social worker or health services aide (HSA), claiming the investigating social worker lied in the detention report, the Department was treating him unjustly, and minors were wrongfully detained. Father also accused maternal grandmother and maternal aunt of coaching minors and discussing case issues with them, despite the lack of any evidence to support his contention. Father continued to bring these matters up, despite being told he needed to discuss them with his attorney. Father also recorded his conversations with social workers without their consent.

In late March 2023, HSAs were no longer available to monitor father's visits, in part because father cancelled a visit after he asked an HSA to change the location of the visit without informing the social worker, and the HSA declined to do so. The HSA told the social worker that father would call him on random days and ask him to monitor father's visits. Father subsequently

4

started having his weekday monitored visits with J.P. only, with one weekend visit including all three minors.

In its April 6, 2023 Interim Review Report, the Department reported its concerns about father not understanding and taking responsibility for the case-related issues that brought the family to the Department's attention. During a February 28, 2023 child and family team (CFT) meeting that included a supervising social worker, an assessor from the multi-disciplinary assessment team, and the pastor from the Baptist church where father was enrolled in parenting and domestic violence programs, the team had to constantly redirect father; he needed to be reminded that that the purpose of the meeting was to collaborate and help with reunification, and that he should address his case concerns with his attorney. The Department requested the court to order drug testing and an Evidence Code section 730 evaluation of father due to his lack of understanding of case issues and his erratic behavior.

In the Department's April 6, 2023 last minute information report, father acknowledged it was difficult to watch all three minors. Despite being repeatedly reminded to arrive prepared for visits, father had a tendency to leave his belongings and the children with the monitor, and scooter to a restaurant to get food. He consistently asked to have visits moved to closer to his home, even though that meant minors would need to travel further from their caregiver's home and their school. Father reported he was unemployed but did not want to use a bus pass. The Department expressed concern about father's mental health, based on his belief that maternal grandmother was brainwashing minors and trying to break the bond between father and J.P. Also, whenever the social worker would state she would not consent to being

recorded, father would exclaim that her refusal was further proof he was right.

In a last minute information report dated April 26, 2023, the Department reported on ongoing issues with father's visits, despite attempts to accommodate him by moving the visits closer to him. Father had declined to sign visitation guidelines provided to him previously, saying he wanted to look them over, and had not yet signed the guidelines by April. During visits, father could only interact with one child at a time, and then would lose track of the other children. On two separate visits, he asked the monitor where one of his children was, and the monitor had to point the child out to father. Also, during visits, father would ask monitors questions about the Department and their job functions. In addition, father would ask social workers to look up his case to see what they could find, which was against Department policy. Despite efforts by the social worker to encourage father to focus on his court-ordered programs, father remained fixated on the initial phases of the case and his belief that maternal grandmother was brainwashing minors, even though the children denied anyone making them sad or upset. The Department acknowledged the strained relationship between father and maternal grandmother. To avoid conflicts between the two, the Department recommended the court order father to not attend minors' medical or dental appointments. It also again recommended an order for father to submit to a psychological evaluation under Evidence Code section 730.

At a hearing on April 26, 2023, father first tried to speak directly to the court, and his counsel stated that she had

explained to him his options under *Faretta*[4] and *Marsden*[5,] that her law firm was representing him, and that the current hearing was not an evidentiary hearing, but she intended to call him as a witness at the six-month review hearing.  Father's counsel requested minors' release to father's care, clarification on whether father was required to complete a 52-week domestic violence program, and that the Department be ordered to provide delivered service logs and to make the social worker and monitor available for the six-month review hearing.  The court ordered that father's domestic violence program did not need to be a 52-week program.  It also ordered the Department to assist father with transportation, and when it inquired into the distance from father to the visit location, father asked to address the court and started complaining that the Department was trying to make it harder for him to attend visits and that the Department was lying.  The court cut off the exchange and asked county counsel if there was anything remaining.  When county counsel asked the court to order father not to record the social workers, father sought permission to speak, and the court denied permission.  Nevertheless, father interjected, explaining that he doesn't record, but asks the social worker why they don't want to be recorded, and then speculated that they must be doing something wrong.  The court cut father off after father started addressing one of the attorneys on the video call, asking why she was smiling.  Mother's attorney asked the court to either permit

---

[4] *Faretta v. California* (1975) 422 U.S. 806 [waiver of the right to appointed counsel].

[5] *People v. Marsden* (1970) 2 Cal.3d 118 [process for requesting new appointed counsel].

unmonitored and overnight visits for mother or give the Department discretion to allow such visits. When the court responded that the Department would have discretion, father again interrupted, challenging the court's authority and accusing the court of breaking the law. The court ended the hearing.

Father attended minors' dentist visit in mid-May 2023. Father became upset when the maternal grandmother described herself as the minors' legal guardian, and the monitoring social worker had to explain that father still had parental rights. Father objected to J.P. being seen, insisting that he had an appointment at a different office. Father's disruptive statements and behavior led the dental office manager to ask father to leave or he would call 911. The children's appointments were cancelled. Father later changed his mind and had no objection to minors seeing the dentist, so the appointment was rescheduled.

With the social worker's approval, father attended a school event where D.P. was presenting. The social worker reiterated to father that he could attend the event, not make a scene, and leave. After the event, father wanted to take D.P. for frozen yogurt, but maternal aunt did not agree. Father started recording maternal aunt without her approval.

Father enrolled in individual counseling at Behavioral Health Services Homeless Outreach Program Integrated Care System (HOPICS). A May 23, 2023 letter from HOPICS stated father had an initial intake for individual counseling on April 12, 2023, that father was cooperative and motivated to address the established treatment goals, and that he was able to process his feelings and emotions about his current involvement with the Department. However, because father had not signed a release form, the HOPICS counselor could not discuss details about

father's mental health or his individual sessions. The social worker texted father to ask him to sign the release. By the end of May, father had also completed his 12-week parenting program at the Baptist church, and had attended 17 weeks of a 52-week domestic violence program.

At a CFT meeting on May 31, 2023, the group agreed that father would have a trial run for unmonitored visits. If he could be on time for visits, supervise all three minors, and not discuss the case during visits, he would have three hours of unmonitored time during his visit on Father's Day, June 18, 2023. However, at the same CFT meeting, father had to constantly be redirected and did not seem to comprehend the case-related issues that brought the family to the Department's attention. Father's support person, the case manager at the Baptist church, abruptly left the CFT meeting at one point because father was not staying focused on the agreed issues of concern.

In the first part of June, father was late to two visits, and showed two videos to minors that the monitor asked father not to continue showing, and father started arguing with the monitor, saying he could show anything he wanted to show, and it was not illegal. The first video was a documentary about the difference between the rich, the poor, and the government. The second video showed a social worker conducting an investigation, with a mother yelling and asking for a warrant, and a voiceover explaining what to do when a social worker visits. Father eventually turned off the second video after D.P. became uncomfortable and asked father to stop playing it. On prior visits, D.P. had asked father to stop arguing with the social worker and comply with the social worker's requests.

Father started unmonitored visits on June 18, 2023. The visits went well, and minors were excited to see father and spend time with him. Father ended the first visit early because D.P. was experiencing fever-like symptoms, and minors did not want to walk to a store. After the first unmonitored visit, D.P. answered "no" when the social worker asked if she had fun, stating that father was getting mad too much and that she did not want another unmonitored visit. The boys (J.P. and Ju.P.) did not say anything. In response to queries after later visits, all three minors said they felt safe, enjoyed the unmonitored visits with father, and wanted them to continue. Because the unmonitored visits were continuing to go well, the Department recommended that the visits continue as unmonitored, with the court giving the Department discretion to liberalize to overnight and weekend visits.

The social worker advised father he could provide a letter for the court's consideration as part of the upcoming July 7, 2023 six-month review hearing. On July 6, 2023, father sent the social worker an email with the subject line "Cease and Desist Order Concerning False Statements Under the Color of Law," which directed the social worker to stop making false and misleading statements and threatened legal action. The social worker responded by clarifying that father had been invited to write a letter to the court so father's allegations and concerns could be known, and his email did not address the concerns father had reported to the social worker. The Department included father's email and the social worker's response in a Last Minute Information for the court.

At the six-month review hearing, father's counsel called one social worker as a witness. The social worker testified that the

visits went well and he had no safety concerns. Denying counsel's request to call another social worker, who also monitored father's visits, the court stated it saw no dispute that father's visits with minors were appropriate. Father's counsel asked for a home of parent-father order, arguing that the Department had not carried its burden to show that returning minors to father's custody would create a substantial risk of detriment. Mother's counsel asked for minors to be returned to mother, or alternatively for an order returning the children to both parents. Minor's counsel first conveyed each child's position, stating that D.P. wanted to return to mother, and have weekend visits with father; J.P. wanted to return to both parents; and Ju.P. was pre-verbal. Minor's counsel then asked the court to place minors with father, because mother had not made enough progress on her case plan. Minors' counsel also asked for mother's overnight visits to continue, with the Department having discretion to liberalize. County counsel asked the court to follow the Department's recommendation of an additional six months of reunification services for both parents, emphasizing that father had been attending classes, but had not done the work needed to show he could safely parent minors. Counsel acknowledged that minors were bonded to father, but argued that a more gradual approach, starting with unmonitored visits, followed by overnights and discretion to liberalize, was the necessary approach. The court took the matter under submission and continued the hearing to July 27, 2023.

The Department's July 27, 2023 last minute information report recounted problems with father's visits, and summarized interviews with mother and father. Father's visits would begin monitored, and end with unmonitored time. A visit on July 15,

11

2023 went well, although D.P. did not participate in the visit because she did not want to exercise with father. The following day, father was scheduled to have a monitored visit from 9:30 a.m. to 11:30 p.m., and then an unmonitored visit from 11:30 a.m. to 2:30 p.m. Father brought scooters to the visit and told minors that maternal grandmother should be buying them things because father paid child support. The social worker offered to transport minors to another location for the unmonitored portion, but father declined. When D.P. asked father if the social worker could take them to the next location, father told D.P. that he, not the social worker, should tell D.P. what to do, and proceeded to have minors scooter through a busy street area without helmets. Although father agreed that the social worker would pick up minors from father's home at the end of the unmonitored portion of the visit at 2:30 p.m., father did not answer the door or repeated phone calls until almost an hour later, causing the social worker and maternal grandmother to worry for the children's safety.

The following week, when the social worker arrived to pick up minors at the end of an unmonitored visit, father continued playing with them and argued with the social worker, saying if they wanted to keep playing he would not force them to go with the social worker. The social worker was not able to transport minors back to maternal grandmother's home until more than an hour past the agreed-upon time. Ultimately, the Department recommended that father's visits be "reverted from unmonitored to monitored due to father placing the children's safety at risk by not being consistent with providing the children with proper protective gear when using scooters, not complying with the visitation hours and inappropriate conversations with the

12

children." The Department also filed an ex parte application to change father's visits from unmonitored to monitored, based on father's actions during visits, including having minors ride scooters on a busy street without helmets, failing to communicate with the social worker for more than an hour after the agreed-upon ending time of a visit, and refusing to encourage the children to return to the social worker at the end of a different visit.

At the hearing on July 27, 2023, the court ordered minors to remain removed from parental custody, emphasizing that one of the case issues was father's disruptive behavior, which was an issue in court as well. Based on father's actions, the court concluded that while father had engaged in services, he had not yet benefitted from them. Father then interrupted, and when the court allowed him to speak, father aired a number of grievances to the court, which did not change its order.

## DISCUSSION

Father contends there is insufficient evidence to support the juvenile court's finding that returning minors to his care would create a substantial risk of detriment to their well-being.

## A. Applicable Law and Standard of Review

When the juvenile court has found jurisdiction under section 300, it may remove a child from a parent pursuant to section 361 at a dispositional hearing only if it finds by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional

13

well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents." (§ 361, subd. (c)(1); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 (*Cynthia D.*) ["At the dispositional hearing, the standard of proof for removal from a custodial parent is clear and convincing evidence"].)

In contrast, at the six-month review hearing, there is a statutory presumption that the child will be returned to parental custody "unless the court finds, by a *preponderance of the evidence*, that the return of the child to [his or her] parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1); *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483 (*Mary B.*), emphasis added.) The Department, not the parent, bears the burden of establishing that detriment. (*Cynthia D., supra*, 5 Cal.4th at pp. 248–249.) Proof by a preponderance standard at this stage sufficiently protects a parent's due process rights because, as our Supreme Court has explained, the statutory scheme requires the juvenile court to have previously made a finding of detriment by clear and convincing evidence. (*Cynthia D.*, at pp. 253–256.)

Whether the placement of a child with a parent would be detrimental is to be examined by looking at the totality of the circumstances. (*See A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059 ["[d]etriment can be shown many different ways"].) Relevant circumstances include (1) the relevant parent's "[c]ompliance with the reunification plan" (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*)), and (2) the "effect . . . return [to the parent's

14

custody] would have on the child" (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 901), as well as (3) "the manner in which the parent has conducted . . . herself in relation to a minor in the past" (*Constance K.*, at p. 705). "In making its determination, the court . . . shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided." (§ 366.21, subd. (e)(1).)

We review a juvenile court's finding that the risk of such detriment exists for substantial evidence. (*In re E.D.* (2013) 217 Cal.App.4th 960, 965–966.) Substantial evidence is evidence that is of " 'reasonable, credible, and of solid value' " such that a reasonable trier of fact could make such findings. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924.) The appealing party "bear[s] the burden to show there was no evidence of a sufficiently substantial nature to support those findings and orders. [Citation.] We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and review the record in the light most favorable to the court's determinations; we do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the trial court's findings. [Citation.] Thus, we do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw. [Citation.]." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

## B. Analysis

Father contends that the court and the Department incorrectly relied on his combative and difficult behavior in

reaching the conclusion that placing minors in his care and custody posed a substantial risk of detriment to their physical and emotional well-being. Father relies on *Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 868 (*Georgeanne G.*), to argue that any theoretical risk could be effectively neutralized by continuing court supervision and family maintenance services, and that because there was no evidence of ongoing domestic violence, there was insufficient evidence to support the court's detriment finding.

First, the court's detriment finding is well supported by the evidence of father's statements and actions during the course of the dependency case. Father's aggressive and conflict-seeking approach towards the Department, the visitation monitors, his case manager at the Baptist church, and maternal relatives were proper considerations for the court in determining father's efforts and progress in taking advantage of the services provided to him. Father's inability to prioritize the purpose of the reunification services over his own personal grievances was sufficient for the Department to show by a preponderance of the evidence that an immediate return to father's custody posed a substantial risk of detriment to their well-being. The reports included evidence of multiple occasions on which father chose to pursue his ongoing conflict, rather than focusing on minors' needs. This evidence was reinforced by father's statements in court, where father insisted on explaining to the court how he had been wronged by the Department.

Father compares this case to *Georgeanne G. v. Superior Court, supra,* 53 Cal.App.5th 856, 868, but we find it to be distinguishable. In *Georgeanne G.*, the social services agency expressed concern that the mother, a victim of domestic violence

16

in her prior relationship with minor's father, lacked insight into the risk posed by her current male companion, who had previously been convicted of felony spousal rape.  (*Id*. at pp. 858, 868.)  Mother argued that because she had satisfactorily completed her court-ordered programs and services, "lack of insight is not a valid ground" to support a detriment finding. (*Georgeanne G.*, at p. 865.)  After discussing several cases, including *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, the court concluded that "[n]one of these cases holds a parent's lack of insight may not be considered by the juvenile court," so long as the evaluation of the parent's insight is " 'based on *evidence* rather than an emotional response.' " (*Georgeanne G.*, at p. 867, citing *Blanca P.*, *supra*, at p. 1750.)  It then went on to conclude that because there was no evidence of domestic violence between mother and her male companion, any concern that minor was at risk of harm was based on speculation and conjecture, and any theoretical risk could be addressed by court supervision and services.  (*Georgeanne G.*, at p. 869.)

Here, in contrast, the evidence of father's ongoing antagonism with maternal grandmother and with the Department dramatically reduced the likelihood that ongoing court supervision and services could ensure minors' protection. Father's words and actions demonstrated that he was unwilling or unable to entertain the idea that the Department's primary focus was on minors' safety and physical and emotional well-being, and that he was unwilling or unable to make those goals his own priority as well.  Father had to be redirected during a CFT meeting to focus on case issues, rather than his grievances with the Department.  The totality of circumstances surrounding father's services and visitation supports the court's

17

determination. Those circumstances include father's history of arriving late for visits, his ongoing discussion of case issues in front of minors during visits, his unwillingness or inability to abide by the visit guidelines, including when and how visits should end, and his disruptive conduct in various settings, including the courtroom, the dentist's office, and a school function.

Although father had enrolled in and was participating in the programs required by his case plan, his inability to refrain from discussing case issues while minors were present, the ongoing adversarial nature of his interactions with the Department, and father's lack of insight supported the determination that placing minors in his custody would create a substantial risk of detriment to their well-being.

## DISPOSITION

The juvenile court's July 27, 2023 orders are affirmed.
NOT TO BE PUBLISHED.


MOOR, Acting P. J.

We concur:


KIM, J.


DAVIS, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.